Filed 7/9/24  In re Roman S. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ROMAN S. et al., Persons Coming Under the Juvenile Court Law. | B331407 |
| | (Los Angeles County Super. Ct. No. 19CCJP04274 C-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| MONIQUE S., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Philip Soto, Judge.  Affirmed.

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Monique S. appeals from the juvenile court's orders denying her petition under Welfare and Institutions Code section 388[1] and terminating her parental rights to her sons Roman S. and Israel R. under section 366.26. Monique argues the court abused its discretion in ruling that neither reinstating reunification services nor returning her sons to her was in the boys' best interests. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Israel Tests Positive for Methamphetamine at Birth, the Department Files a Petition Under Section 300, and the Court Sustains the Petition*

When Monique gave birth to Israel in June 2019, she and Israel tested positive for methamphetamine. Monique claimed that she had not used methamphetamine "anytime in the last three days" and that she had stopped using the drug after she learned she was pregnant. The juvenile court authorized the Los Angeles County Department of Children and Family Services to remove Israel and his older brother Roman (who was 14 months old) from Monique. The juvenile court also authorized

_____

[1] Statutory references are to the Welfare and Institutions Code.

2

the Department to remove Monique's two older children, Melanie L. and Mylah L. (who lived with their father, Ruben L., and are not subjects of this appeal) from Monique.

The Department filed a petition under section 300, subdivision (b), alleging that Monique's "illicit drug use" placed Israel at risk of serious physical harm and that her substance abuse inhibited her ability to provide her children regular care and supervision. The court detained Roman and Israel from Monique and placed them with foster parents Franklin B. and Brielle B.

In September 2019 the juvenile court sustained the allegations in the petition; declared Roman, Israel, Melanie, and Mylah dependent children of the court; removed Roman and Israel from Monique; and found releasing the boys to their father Israel Sr. would be detrimental to them. The court ordered Monique to complete a drug and alcohol program with random testing, a parenting program, and individual counseling and authorized her to have monitored visits. The court granted Ruben full legal custody of Melanie and Mylah and terminated its jurisdiction over the girls.

B.  *The Juvenile Court Terminates Reunification Services, Monique Begins To Comply with Her Case Plan, and the Court Reinstates Reunification Services*

In March 2020, at the six-month review hearing under section 366.21, subdivision (e), the juvenile court found Monique had not complied with the court's order to complete the programs in her case plan. She had also missed most of her scheduled weekly visits. The court concluded it would be detrimental to return Roman and Israel to Monique and maintained their placement with Franklin and Brielle. The court terminated Monique's reunification services and set a selection and

3

implementation hearing under section 366.26. Due to the COVID-19 pandemic, the court later continued the selection and implementation hearing to January 2021.

In those 10 months, Roman and Israel, both of whom had developmental disabilities, received services through a regional center.[2] Roman and Israel developed a "strong bond" with Franklin and Brielle and sought their "affection and attention." Franklin and Brielle ensured the boys received "all necessary services in addition to their regular medical and dental care."

Meanwhile, in July 2020 Monique gave birth to Madilin S. The court detained Madilin and placed her in Franklin and Brielle's home. The court later sustained allegations in a petition the Department filed under section 300, subdivisions (b) and (j), regarding Madilin.

Monique failed to regularly visit the boys, missing numerous visits throughout the summer and fall of 2020. When Monique finally visited, the social worker observed she struggled to supervise Roman, Israel, and Madilin at the same time. The social worker reported that, during one visit, she had to stop

---

[2] To discharge its duty to provide services to and support for persons with developmental disabilities, the Department of Developmental Services "uses a network of private, nonprofit entities called 'regional centers.' [Citation.] Regional centers do not themselves provide services; instead, they evaluate the developmentally disabled persons . . . , develop individually tailored plans for their care, enter into contracts with direct service providers to provide the services and support set forth in the plans, and monitor the implementation of those contracts and the [persons'] plans." (*Shalghoun v. North Los Angeles County Regional Center, Inc.* (2024) 99 Cal.App.5th 929, 937.)

Roman from running into the street because Monique left him on the playground unsupervised.

Shortly before the January 2021 hearing under section 366.26, Monique filed a petition under section 388, asking the juvenile court to reinstate reunification services or to return Roman and Israel to her.  Monique claimed she had completed a substance abuse program, parenting classes, and individual counseling; had taken responsibility for her actions that led to this case; and had unmonitored visits with Madilin without any problems.  The court continued the hearing under section 366.26 for three months and set the hearing on Monique's petition under section 388 for the same day.

A regional center psychologist diagnosed Roman and Israel with autism, and both boys began therapy sessions five days a week.  In April 2021 the court reinstated reunification services for Monique and ordered the Department to notify Monique of the boys' upcoming appointments for speech and other developmental therapy.

Over the next 11 months, Roman and Israel continued to bond with Franklin and Brielle; Roman began to call Brielle "mama" and looked to her for guidance and comfort.  The social worker reported that Monique was frequently late to the children's therapy sessions Monique was able to attend and that she missed half of their medical appointments.  Counsel for Monique told the court Monique's residence was far from the center where the boys received services.  The court ordered the Department to assist Monique with transportation to the boys' therapy sessions and medical appointments.

From December 2021 to February 2022 the Department sent Monique monthly checks ($1,450 in total) and bus passes to assist her with traveling to the therapy center to attend the boys' appointments.  The social worker observed that, despite the

5

Department's financial support, Monique "continued to miss therapy sessions and visits" with the boys. The social worker reported that the Department provided Monique "all of the children's service providers' contact information" and that Monique was "well aware of the children's therapy schedule." The social worker's log reflected numerous sessions where Monique did not attend, arrived late, or could not participate because she had a new baby (John) in her care. Israel's occupational therapist told the social worker that Monique attended only one occupational therapy session (and arrived for only the last 10 minutes). The therapist stated that she encouraged Monique to attend the sessions to learn techniques she could use when she cared for Israel, but that Monique had "not increased her attendance." Monique explained to the social worker that she had "emergencies" and that she did not have anyone to watch John.

In March 2022 the court returned Madilin to Monique and later terminated its jurisdiction over her. The court extended reunification services for six months (for Roman and Israel) and ordered the Department to liberalize visits once Monique demonstrated she could keep the children safe and to notify Monique of the children's therapy and medical appointments.

In the next six months Monique had only two in-person visits and one virtual visit with the boys. The social worker's visitation log showed Monique canceled or failed to show up for the other scheduled visits. The social worker also noted Monique attended only two of Israel's regional center appointments and none of the boys' medical or dental appointments. Meanwhile, Monique regained custody of Melanie and Mylah and, in the summer of 2022, gave birth to another baby (Damian).[3]

---

[3]     Monique thus had custody of five of her seven children.

In September 2022 the court terminated reunification services, authorized Monique to continue to have unmonitored visits with Roman and Israel, ordered the Department to give Monique notice of the boys' regional center and other health appointments, and set a selection and implementation hearing under section 366.26. During the fall Monique continued to miss visits (she had three unmonitored in-person visits and one virtual visit). During one visit in November 2022, the social worker observed Monique failed to supervise Roman at a playground.

In January 2023 Monique filed her second petition under section 388. She cited the progress she had made in overcoming her substance abuse. Monique asserted that Roman and Israel had a bond with their siblings and that it would be in their best interests to grow up with them. The court deferred ruling on the petition to give Monique a chance to complete "services and visits."

Four months later, the Department prepared a report addressing the court's concerns with Monique's efforts to attend the boys' medical and therapy appointments. Roman and Israel's occupational therapist stated that the boys' progress depended heavily on consistent attendance in the program; that Roman had made great progress because he had been attending consistently and that, if he continued to make progress, he would be ready to transition to a general education kindergarten; and that Israel regressed after missing sessions due to illnesses or holiday breaks. The boys' special education preschool teacher confirmed the connection between consistent attendance and progress, especially for Israel, who needed one-on-one support in developing his communication skills, and emphasized that gaps in attendance could negatively affect his progress.

The social worker's log showed that from May 2022 to June 2023 Monique missed most of the boys' medical and therapy

appointments.  The social worker reported that Monique failed to visit consistently.  When overnight visits began in December 2022, Monique's visits became more consistent.  During visits the social worker observed Roman interreacted mostly with Melanie and referred only to Madilin by name.  The social worker said Israel appeared "content in the presence of his siblings" and seemed "to participate in various aspects of play with them."

Two months later, Dr. Ronald Banks conducted a bonding study.  Dr. Banks stated that, while Monique appeared "to have a good bond" with Roman and Israel, the bond was "an insecure attachment."  Dr. Banks observed that Roman engaged more with his sisters than with Monique, was not physically affectionate with Monique, and "often appeared to be confused and in a daze"; meanwhile, Israel "appeared to dissociate" and slept for most of the bonding study.  Dr. Banks concluded that Franklin and Brielle appeared "to have a strong bond" with Roman and Israel and that the bond was "secure."  Dr. Banks observed "ongoing physical affection" between the boys and their caregivers.  The doctor observed that at Franklin and Brielle's house Israel was "active, mobile, happy, [and] verbal," which was "in great contrast" to his behavior at Monique's house, where he "emotionally remove[d] himself from the immediate environment."

C.    *The Court Denies Monique's Second Petition Under Section 388 and Terminates Her Parental Rights*

Monique submitted a written brief in support of her petition under section 388.  She argued that her "continued sobriety" demonstrated a change in circumstances and that it was in Roman's and Israel's best interests to grant her petition because they shared a "strong bond" with her and their five siblings.  Monique argued that she was having overnight

8

visits with the boys twice a week and that there was no indication she was not providing "appropriate care." She said that she would be eligible for "in-home support services" from the regional center and that her two sisters and a friend offered to assist her with "transportation and daycare." Counsel for Roman and Israel joined Monique's petition and added it would be in the boys' best interests to return to Monique's care because Monique had shown she could safely parent all of her children and the boys had a "fundamental interest in living with [their] parents."

The Department's brief summarized Monique's poor visitation record and highlighted the boys' strong bond with Franklin and Brielle. The Department said Monique made little effort to participate in the regional center services the boys received. In the Department's view, after an additional 17 months of reunification services, the court's focus should be on ensuring permanency for the boys.

At the hearing on Monique's petition in August 2023 the parties stipulated that, if called to testify, Monique would state that she attended Israel's dental appointment approximately two weeks ago and that Israel "appeared comforted by her presence." The parties also stipulated that, if called to testify, Roman would state he wanted to live with his sister Madilin. Brielle testified that, before Roman's overnight visits at Monique's house, he says "'Don't make me go'" and that she spends over an hour "getting him to not cry." After Roman returns from the visits, he tells Brielle, "'I don't want to go again. Why did you make me go?'" Brielle stated Israel remains "completely attached" to her after the overnight visits and does not want her to leave his sight.

The court found that, although it appeared Monique had "beaten her drug addiction and will remain clean and sober so long as something else doesn't happen to trigger a relapse," she had not demonstrated that granting her petition under

section 388 was in the best interests of Roman or Israel. The court stated that, though Monique had "done a lot to turn the corner," given Roman's and Israel's special needs the court had to consider the "remote possibility" that, should Monique relapse, her family "could be splintered dramatically," with the children ending up in different foster homes. Addressing Monique's argument that, with the help of the Department, she would be able to take care of the boys' special needs, the court stated, "We haven't seen that evidence." The court acknowledged that Monique recently attended a dental appointment, but stated that Roman and Israel, both on the spectrum for autism, "need all." The court cited the boys' speech problems and developmental delays and stated, "There's been no evidence presented to this court that [Monique] has and will address them." The court considered whether, with an additional six months of services, Monique would be able to take Roman and Israel to every appointment and put into practice at home what the boys learned in therapy, but the court questioned whether Monique and the boys had a relationship that could be "preserved and enhanced by services." The court stated Dr. Banks's study showed the boys saw themselves "as visitors" in Monique's home, not as "part of this family." The court commented that it "tried everything" to help Monique get the services "to get her family back together" and that the case was "long past" the six months the law allowed for reunification services. The court found providing services for another six months would just "delay permanency" for Roman and Israel and denied Monique's petition.

Turning to the hearing under section 366.26, the juvenile court found that Roman and Israel were adoptable and that no exception to adoption applied. The court terminated Monique's parental rights and designated Franklin and Brielle as the prospective adoptive parents. Monique timely appealed from the

order denying her petition under section 388 and the order terminating parental rights.[4]

## DISCUSSION

A. *Applicable Law and Standard of Review*

Section 388, subdivision (a), provides: "'Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court.'" (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 317, *In re D.P.* (2023) 92 Cal.App.5th 1282, 1291; *In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194.) "At a hearing on a motion for change of placement, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child." (*Stephanie M.*, at p. 317; see *In re Jasmon O.* (1994) 8 Cal.4th 398, 415; *D.P.*, at p. 1291; *Matthew M.*, at p. 1194; California Rules of Court, rule 5.570(e).) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are

---

[4] In her briefs Monique does not challenge the order terminating her parental rights, other than to challenge the order denying her petition under section 388. Counsel for Roman and Israel also filed a notice of appeal, but their appellate counsel subsequently filed a notice of abandonment and a request for dismissal, which this court granted.

11

no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child.  [Citation.]  A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Stephanie M.*, at p. 317; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 309; *D.P.*, at p. 1295; *In re J.M.* (2020) 50 Cal.App.5th 833, 847.)[5]

"We review a juvenile court's denial of a section 388 petition for abuse of discretion, and review its factual findings for substantial evidence.  [Citation.]  We may disturb the exercise of the court's discretion only when the court has made an unreasonable or arbitrary determination."  (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 846; see *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *In re D.P.*, *supra*, 92 Cal.App.5th at p. 1291.)  "We do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the juvenile court.  [Citation.]  We ask only whether the juvenile court abused its discretion with respect to the order it made."  (*In re Matthew M.*, *supra*, 88 Cal.App.5th at p. 1195; see *In re Maya L.* (2014) 232 Cal.App.4th 81, 104, fn. 6.)  "'"When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute

---

[5]     Because the juvenile court found Monique demonstrated changed circumstances, and the Department does not challenge this finding, we only address the court's finding she failed to demonstrate granting the petition would be in the boys' best interests.

12

its decision for that of the trial court.""" (*Stephanie M.*, at pp. 318-319; see *In re I.B.* (2020) 53 Cal.App.5th 133, 153.)

B.  *The Juvenile Court Did Not Abuse Its Discretion in Denying Monique's Petition Under Section 388*

As discussed, "a primary consideration in determining the child's best interests is the goal of assuring stability and continuity.  [Citation.]  'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role.  That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.'" (*In re Stephanie M., supra*, 7 Cal.4th at p. 317; accord, *In re I.B., supra*, 53 Cal.App.5th at p. 159; see *In re J.C.* (2014) 226 Cal.App.4th 503, 527 ["after reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability"].)

Monique failed to show how returning Roman and Israel to her custody or obtaining another six months of reunification services (in addition to the almost 24 months of services she already received) would promote permanence and stability for her boys.  In fact, the evidence showed the opposite.

Roman and Israel, both on the spectrum for autism, required a high level of services for their developmental delays. They participated in several hours of therapy every weekday. Roman's and Israel's special education teachers and therapists emphasized the importance of regular attendance, and the boys' substantial progress over the years demonstrated the efficacy of the services Franklin and Brielle made a part of the boys' daily

13

routine. Though Monique acknowledged the boys' "Autism diagnoses" and promised "to follow through with their Regional Center services," her track record showed she probably would not.

Even with financial assistance from the Department and an extended period of reunification services, Monique attended only a handful of Roman's and Israel's medical, dental, and therapy appointments. The Department gave Monique documents to give to the boys' school to obtain information about upcoming meetings, but Monique failed to inquire about or attend either child's most recent meeting concerning their Individualized Education Plan (IEP).[6] The court reasonably concluded that, under Monique's care, the boys might not receive all the services they needed to continue their development. Notwithstanding Monique's assertion she would have her sisters and a friend to assist with childcare and transportation, she did not provide evidence that this assistance would be available consistently or that she would prioritize the boys' many appointments when caring for her five other children, two of whom were toddlers. Gaps in the therapy for the boys would not only interfere with their progress in learning basic life skills (such as speaking), but also with their need for a stable routine. At best, Monique presented an uncertain future for her boys, in

_____

[6] "'An IEP is a comprehensive statement of a disabled child's educational needs and the specifically designed instruction and related services that will meet those needs. [Citation.] It is developed by a school official qualified in special education, the child's teacher, and the parents. [Citation.] It guides the school system as to how the child will be educated.'" (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1270, fn. 1.)

14

contrast to the certainty and guaranteed access to services that their current placement gave them.  (See *In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319 [where the child had "special needs," the juvenile court did not abuse its discretion in "placing special weight on the child's need for stability"]; *In re J.C.*, *supra*, 226 Cal.App.4th at p. 526 [where the child had "a loving and stable placement" for most of her life, the mother failed to show how her child's "best interests in *permanency and stability* would be furthered by the proposed modification"].)

Monique argues that she had difficulty attending the boys' appointments because she lived far from the service providers and that, if she regains custody, the services will be closer to her home.  Maybe, but the record shows that Monique not only failed to attend most of the boys' therapy sessions and medical appointments, but that she also neglected to learn about and guide the boys' mental, physical, and emotional growth during the four years they lived in foster care.  And, until the court authorized overnight visits, Monique missed numerous scheduled visits, virtual and in-person.

Citing *In re Kimberly F.* (1997) 56 Cal.App.4th 519, Monique argues the court erred in assessing the best interests of the boys by comparing her home with Franklin and Brielle's.  In *Kimberly F.* the mother lost custody of her younger children because she failed to keep a sanitary home, but after the juvenile court terminated reunification services, she cleaned up her home and filed a petition under section 388 to regain custody or obtain additional reunification services.  (*Id.* at p. 525.)  Acknowledging the caregivers did "a truly excellent job" of rearing the children, the court in *Kimberly F.* held that, in assessing the best interests of the child under section 388, the juvenile court should not

15

"simply compare the household and upbringing offered by the natural parent or parents with that of the [caregivers]." (*Id.* at p. 529.)  Rather, the court held, the juvenile court should examine "a number of factors," including "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and [caregivers]; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Id.* at pp. 530, 532.)

Putting aside that courts and commentators have criticized *Kimberly F., supra,* 56 Cal.App.4th 519 for failing to consider the shift in focus to the child's need for permanency and stability after the court has terminated reunification services (see, e.g., *In re J.C., supra,* 226 Cal.App.4th at p. 527; Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2024) § 2.140[5]), the juvenile court here did not abuse its discretion.  The court did not compare whether Monique or Franklin and Brielle had more resources to provide things like food, clothes, or toys; the court compared whether Monique or Franklin and Brielle had demonstrated greater capacity and willingness to provide the children with the therapies they needed to become more functional in their daily lives.  The record amply supported the juvenile court's finding Roman's and Israel's communication abilities flourished under Franklin and Brielle's care.  Franklin and Brielle consistently took the boys to their therapy sessions and practiced with the boys at home the skills they learned in therapy.  One speech clinician acknowledged Brielle's contribution toward Israel's recent progress in using the

communication tools he learned in therapy.  The evidence showed Monique would not have nearly the same commitment.

The juvenile court also compared the bonds between the boys and Monique and the bonds between the boys and their caregivers, and gave greater weight to the boys' secure (as opposed to insecure) attachment to Franklin and Brielle.  There was nothing erroneous about that.  (See *In re D.P.*, *supra*, 92 Cal.App.5th at p. 1295 [juvenile court properly focused on the "'positive and secure attachments'" between the child and her foster family and "expressed concern about the 'trauma' [the child] would face if she were 'removed . . . from a family that she has known since only a few days old'"]; *In re M.H.* (2018) 21 Cal.App.5th 1296, 1305-1306 [though placing the child with a relative may have offered the child "important biological family connections," the juvenile court did not abuse its discretion in keeping the child with his foster family, given "the uncertainty of how [he] would respond to removal from the parental figures he had known since birth"].)  Although Roman and Israel at times seemed to enjoy the company of their siblings, Dr. Banks's study found the boys were reserved (Roman) or withdrawn (Israel) at Monique's house and displayed confidence and affection only when interacting with Franklin and Brielle.  In concluding that providing additional reunification services was not in the boys' best interests, the court properly considered the lack of a "familial relationship" between them and Monique.  (Cf. *In re I.B.*, *supra*, 53 Cal.App.5th at p. 159 [mother rebutted the presumption that remaining in foster care was in her child's best interests with evidence that the child was bonded to her and that she "never missed or was late for a visit"].)

Finally, the court considered Brielle's testimony that overnight visits at Monique's house made Roman and Israel feel anxious, confused, and insecure. The social worker's reports, which the court also considered, included a statement by the boys' special education teacher that, during the months that coincided with the increase in overnight visits at Monique's house, Israel's "aggressive behavior" and Roman's "verbal aggression" increased. The court did not abuse its discretion in considering multiple factors and concluding that prolonging this stressful period of uncertainty, when the boys had a secure and stable attachment to caregivers who had been meeting their needs for most of their lives, would not promote their best interests in permanency and stability.

## DISPOSITION

The orders are affirmed.

SEGAL, Acting P. J.

We concur:

FEUER, J.

STONE, J.

18